## THE STATE OF KANSAS v. JOHN T. REED.

### No. 15,875.   (100 Pac. 66.)

### SYLLABUS BY THE COURT.

HOMICIDE—*Immaterial Error.* Sundry assignments of error considered, and *held,* that no prejudice to the appellant's substantial rights appears.

Appeal from Finney district court; WILLIAM H. THOMPSON, judge. Opinion filed February 6, 1909. Affirmed.

*Fred S. Jackson,* attorney-general, *Edgar Roberts,* county attorney, for The State; *George L. Miller,* and *O. H. Foster,* of counsel.

*M. W. Sutton, A. Hoskinson, W. R. Hopkins, T. A. Scates, R. W. Hoskinson,* and *R. J. Hopkins,* for appellant.

The opinion of the court was delivered by

BURCH, J.: John T. Reed appeals from a conviction of murder in the second degree for the killing of W. H. Browning. The court has given careful consideration to every proposition urged for a reversal, and is unable to find anything fairly approaching error affecting appellant's substantial rights.

Appellant's chief grievance seems to be that an angry public sentiment had been aroused in his county over the fact that previous killings had gone unpunished,

that this sentiment demanded a victim, and that he is the unhappy sacrifice. The only suggestion contained in the abstract of the existence of such a sentiment was made by appellant's counsel in the examination of a juror named Schrock, who denied any knowledge of it, had never heard it talked about, and did not share it if such a feeling was rife. He answered as follows:

"Ques. Mr. Schrock, have you heard or do you know of any feeling against defendants in criminal cases now in Garden City, Kan., because of the former release of criminals, particularly Mr. Scott, charged with criminal offenses? Ans. No, sir.

"Q. You have n't heard that talk? A. No, sir.

"Q. You have n't heard that there was any such feeling? A. No, sir.

"Q. Now, I will ask you if you share in any such feeling, Mr. Schrock, yourself? A. Well, I don't know. It is a pretty hard proposition.

"Q. How? A. I don't hardly know.

"Q. You understand me, don't you? Of course I want to get at the state of your feelings. I will ask you, Mr. Schrock, do you know of a feeling existing in this community against the defendant in this or any other criminal case being discharged because of the fact that other criminals, other parties charged with crime, have been discharged, particularly referring to the Scott case? A. No, sir.

"Q. You don't know of any such feeling existing? A. No, sir.

"Q. In this community? A. No, sir.

"Q. You have never heard it talked about? A. No, sir.

"Q. If such feeling did exist, do you share in it? Do you think, Mr. Schrock, that because of the fact that Mr. Scott was let off, and others that were wrongfully acquitted, that this party ought to be put in by reason thereof? (By the court: The question is whether he has any such feeling himself personally.) A. No, sir, I have n't.

"Q. You believe in every case being tried on its own merits and standing on its own merits? A. Yes, sir.

"Q. Regardless of what the community may think? A. Yes, sir.

"Q. That is your idea of it exactly, is it? A. Yes, sir.

"Q. If you were kept on this jury, and you knew, that is you felt, that the defendant was not guilty, you could find him not guilty even if you knew the whole community was against him, could you? A. Yes, sir."

On the motion for a new trial it was shown that this juror had a conversation with one Coffman in the presence of Coffman's wife the day after the deceased was buried, the substance of which was stated as follows:

By Coffman: "Well, I can't do it; I can't tell just positively, because I had no idea of there ever being anything of it. He passed along the road and spoke to me, and the conversation came up something like this: 'What do you know about this killing?' 'Well,' I says, 'I don't know very much about it; I buried Mr. Browning'—I think I said yesterday. He was buried on Sunday, and I think it was Monday afternoon, and I just spoke up and says: 'Now, Mr. Schrock, I think this killing has went a little too far. We had a neighbor killed over there a little while ago, and I think it has gone a little too far; there is too much of it.'

By the Court: "Q. You said that? A. That was what I said, and he said, 'I think so, too.' Now that is the sum and substance of it all that I heard."

By Mrs. Coffman: "Well, now, Mr. Schrock came along and he asked my husband about this killing, and my husband told him that he did n't know much about it, and I remember of him telling him just that this killing he thought had gone a little too far, and so Mr. Schrock says, 'I think so, too.' Of course I don't remember just the words they did use."

It is claimed this evidence shows the existence of the sentiment described, that the juror shared it and carried it into the jury-room, that his answers on *voir dire* were untruthful, and that if he were not disqualified he at least misled appellant into waiving a peremptory challenge and accepting him as a fair-minded juror. None of these conclusions follows. Coffman's belief that killings had gone too far did not make public sentiment even on that narrow question, and his statement of his feeling did not pretend to be an expression of public sentiment. Schrock's concurrence

with Coffman still left the matter the private opinion of two acquaintances. Neither one exhibited any prejudice against any man on trial for a killing and neither one shared in any degree the feeling that an example should be made of some one to atone for previous miscarriages of justice. If all good citizens of the county had felt as Coffman and Schrock said they did, still there would be nothing to indicate the prevalence of a mob spirit which would pervert justice and sacrifice the appellant because others had been wrongfully acquitted. A man who had been forced against his will to slay a domineering, quarrelsome, fighting antagonist to save his own life need have nothing to fear. Schrock's answers were entirely consistent with his conversation with Coffman. One related to the attitude of the public toward persons charged with crime and toward the trial of criminal cases. The other related to a personal belief that the killing business had been carried too far in that locality. He disclosed truthfully the state of his mind as far as he was examined respecting it, and proved himself to be duly qualified to act as a juror in appellant's case.

Appellant claims the court itself put the jury in a frame of mind favorable to the toleration of the notion that previous failures of justice could be righted by convicting him, through an instruction relating to the duty and responsibility of the jury. In this instruction the rights of the defendant were carefully guarded, as follows:

"In deciding questions of fact you are to be guided by the law and the evidence alone—by the evidence which was given during the trial and not from any supposed knowledge of events or occurrences derived from any source other than the testimony given before you in open court, and by the law as given to you by the court, which must be your only guide in that respect. . . . You must bear in mind that the rights of the defendant are sacred to him, and you are bound to be especially careful that an innocent person shall not be punished and disgraced; that no injustice be

done the defendant, and that he have the benefit of
every reasonable doubt and of the just presumption of
innocence with which the law not only mercifully, but
wisely and justly, clothes and invests him."

In view of these admonitions it can not be said that
the remainder of the court's remarks, which were
ethically and sociologically sound, were prejudicial.
This court has said, and has repeated the statement,
that "ordinarily it may be better to omit anything like
a discussion of general policy, or of the duty of jurors
in reference to the enforcement of criminal laws, and
of the effect that a verdict may have on the welfare of
the body politic." But no judgment has been reversed
because a lecture of the kind in question has been de-
livered.

The item of evidence claimed to have been wrong-
fully admitted was proper. The question was, What
ground did the appellant have for believing he was
rightfully at the place where the homicide took place?
He had communicated with one of the highway com-
missioners about the road. The fact that no order to
open the road had been made by that body was rele-
vant.

Appellant had been actively interested for a long
time in having the road in question made available for
public travel. He had gone to the source of authority,
the trustee, a member of the board of highway commis-
sioners, to secure information and action. Fences had
to be removed to get to the place where he undertook
to work. Something in the nature of an opening up of
the road was involved. There was a question whether
the road had ever been established or laid out at all.
In instruction No. 14½ the court merely referred to
the fact that there was testimony bearing upon these
mooted matters, and then said in explicit terms that
the jury should determine what the facts were. This
statement was followed by a clear, definite and express
limitation of the use to be made of the facts, whatever
they were, and by a full, accurate and unequivocal

declaration of the right of the defendant in the premises. This being true, the introductory matter of the instruction is not open to the aspersions made against it. It is impossible that the jury could have been misled by it, and when it is read with the exposition of the law following the appellant has no cause to complain of what was said, either in part or as a whole. Besides this, the rule of law stated was applied directly to the issues in the twenty-third instruction, so that all possibility of a misunderstanding of it was excluded.

Other instructions which were given and requests for instructions which were refused have been examined with the care the importance of the case demands and no prejudicial error appears. No useful purpose would be subserved by discussing them at length.

There is an irreconcilable conflict in the testimony relating to the facts upon which the appellant necessarily relied for exculpation. He had more witnesses to swear his way than the state commanded, but the jury has chosen whom it would believe. Nothing would be gained by rehearsing the contradictory accounts. The verdict is abundantly supported by competent and credible evidence, and that is as far as this court can investigate.

The judgment of the district court is affirmed.